# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

THEODORE KURIGER and CHRISTIAN  :
KIEFER, individuals,  :
  :
      Plaintiffs,  :
  :
    v.  :
  :  CIV. No.
  :  _____
MODE GLOBAL, LLC, a Delaware limited :
liability company, TTS, LLC, a Delaware  :
Limited Liability Company  :
and  :
LANCE WAYNE MALESH, an individual,

      Defendants.

## COMPLAINT

Plaintiffs Theodore Kuriger ("Kuriger") and Christian Kiefer ("Kiefer") (collectively, "Plaintiffs"), by their undersigned counsel, for their complaint against Defendants, Mode Global, LLC ("Mode Global"), TTS, LLC ("TTS") (Mode Global and TTS are, collectively, "Mode") and Lance Wayne Malesh ("Malesh" and collectively with Mode, "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.    This action arises from Defendants' lengthy campaign of unlawful coercion, fraudulent inducement, bad-faith contractual manipulation and contractual breaches, designed first to force Plaintiffs to sell substantial assets of their successful

logistics company, Jillamy, Inc. ("Jillamy"), to Mode on unfair terms, and thereafter to deprive Plaintiffs of millions of dollars in additional consideration they were promised through earnout payments.

2.    Defendants' misconduct included but was not limited to placing unlawful economic duress on Plaintiffs and making fraudulent misrepresentations to compel Plaintiffs to enter into a contractual agreement to sell valuable assets, breaching express contractual obligations and breaching the implied covenant of good faith and fair dealing by taking arbitrary and unreasonable steps to deprive Plaintiffs of the benefit of their contractual bargain.

3.    Plaintiffs seek recission, compensatory damages, punitive damages, declaratory relief, preliminary and permanent injunctive relief, and such other relief as this Court deems just and proper.

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different states. Plaintiffs are both citizens of Pennsylvania.  Upon information and belief, Mode Global and TTS are Delaware limited liability companies whose members are citizens of states other than Pennsylvania, and Malesh, upon information and belief, is a citizen of Texas.

5.      In addition, Plaintiffs and Mode contractually agreed, in the Equity and Asset Purchase Agreement ("EAPA"), in relevant part, that "THE PARTIES SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE STATE COURTS LOCATED ANYWHERE IN THE STATE OF DELAWARE OR THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE."

6.      Venue is proper in this District under 28 U.S.C. § 1391 because Defendants Mode Global and TTS are Delaware limited liability companies and because the parties contractually agreed to litigate any claims arising under the terms of the EAPA in Delaware.

## THE PARTIES

7.      Plaintiff Theodore Kuriger is a citizen of the State of Pennsylvania and was a co-founder and owner of Jillamy, which agreed under the EAPA to sell certain assets and equity interests to Mode and its affiliates.

8.      Plaintiff Christian Kiefer is a citizen of the State of Pennsylvania and was a co-founder and owner of Jillamy, which agreed under the EAPA to sell certain assets and equity interests to Mode and its affiliates.

9.      Defendant Mode Global, LLC is a Delaware limited liability company engaged in the logistics and transportation industry.

10.     Defendant TTS, LLC is a Delaware limited liability company.

11.    Defendant Lance Wayne Malesh is an individual who is the Chief Executive Officer of Mode Global and upon information and belief is a citizen of the State of Texas.

## FACTUAL BACKGROUND

### A.    Jillamy's Success and Relationship with Mode

12.    Jillamy was founded by Plaintiffs and subsequently became one of the most successful independent logistics companies in the United States with operations, offices and agents across the United States and in 195 countries worldwide.

13.    Jillamy operated as an IBO (Independent Business Owner) for Mode starting in 2002.  Jillamy cultivated, trained and onboarded some of the best and brightest transportation sales staff and operators in the logistics space. Starting with just one "mode" of transportation, Jillamy grew into more verticals than any other IBO within the Mode network, and eventually accounted for a material portion of Mode's revenue.

14.    Jillamy acted as an operational arm and sales arm of Mode, with the responsibility for finding customers, moving freight and invoicing customers. Jillamy recruited hundreds of sales representatives and operations personnel in connection with the Mode commercial arrangements.  Mode provided administrative

support, including collections, payables and technology to the customers onboarded by Jillamy. Jillamy and Mode shared the gross profit generated from customers.

15. During the span of the commercial relationship with Mode (the "Mode Business"), Jillamy grew and purchased other types of transportation businesses not supported by Mode, including but not limited to trucking, customs brokerage, e commerce and warehousing divisions (the "Non-Mode Business"). Often, customers would require services from the Mode Business and Non-Mode Business, creating overlap that generally was mutually beneficial to all parties involved.

16. Mode benefited substantially from the Non-Mode Business, primarily for two reasons: first, customers would often require services encompassing both the Mode Business and Non-Mode Business, allowing Mode to generate revenue from customers that it otherwise would not have had the ability to service; and second, Mode was able to avoid the substantial capital investments, insurance costs, liabilities, and personnel needs required to start and operate asset heavy businesses like trucking and warehousing.

17. By 2022, which was a record year for the freight industry, Jillamy accounted for nearly one billion dollars in revenue to Mode.

18. In October 2023, Mode and Jillamy executed a ten-year extension to their IBO agreement, which did not allow either party to terminate without cause, and even then, only on 180 days of notice, and required Jillamy to utilize Mode for

all of its intermodal brokerage business, which represented the vast majority of Jillamy's revenue.

**B.**    **Defendants' Pursuit of Jillamy and Campaign of Coercion**

19.    Defendant Malesh became the Chief Executive Officer in 2020 and by 2021 sought to expand in-house operations and limit the IBO model that historically generated nearly all of Mode's revenue.  It was widely rumored at the time in the industry that Mode was looking for a buyer, but, upon information and belief, management thought that the IBO model, where each office is independently owned and operated, was holding it back.

20.    Starting in 2022, Malesh started to approach and aggressively pursue Plaintiffs about selling Jillamy's Mode Business to Mode. The Plaintiffs were distrustful of Malesh and his heavy-handed approach and operational objectives. Jillamy also feared that Private Equity firms generally are not considered to be employee friendly, and that Jillamy employees would be mistreated by Mode, a portfolio company of York Capital.  Jillamy had cultivated a family atmosphere, and Plaintiffs did not want that to go away.

21.    Nonetheless, after immense pressure from Malesh, in late 2023, Jillamy agreed to begin a due diligence period with Mode.  After months of analysis that included a costly, long and intense third-party accounting and quality of earnings review by Alvarez & Marsal, Mode drafted a Letter of Intent and presented it to

Kiefer and Kuriger in Spring 2024, with a live meeting to discuss in July 2024. This offer was not highly attractive to Kiefer and Kuriger, as it promoted an earnout in respect of the majority of the purchase price. However, Malesh and Mode's chief financial officer made a plethora of promises and representations at the meeting to assuage any concerns, including that Jillamy's business would continue to be run by Kiefer and Kuriger, that Mode would not interfere with Jillamy's business, that Jillamy's business model would not be modified and that Jillamy would have the full force of Mode behind it, in each case to generate growth to meet the earnout target, which was represented by Mode as "can't miss." These representations came from Malesh, the Company CFO and the Company COO, Norm Frigon, who had previously sold his logistics company to Mode and who doubled down on Malesh's promises to Plaintiffs.

22.    The announcement of the prospective sale, however, did not go over well with most sales and operational personnel at Jillamy, given Mode's reputation as a toxic environment after the hiring of Malesh, who was widely known by this time to be abusive to and dismissive of staff, agents, vendors, channel partners and customers. In addition, there was an industry wide economic pullback happening from the record years of 2021 and 2022, as 2023 started strong but was dropping quickly, leading Kiefer and Kuriger to believe that it was not a prudent time to sell Jillamy. The transaction would also lead to costly refinancing requirements from

Jillamy's bank for loans obtained in the historically low interest rate environment due to the change of control.

23.   In August, Kiefer and Kuriger called Malesh and explained that they would like to put the transaction on hold indefinitely. During this call Malesh became belligerent, telling Kiefer and Kuriger that delay or backing out was not an option.   Malesh angrily threatened Plaintiffs that he would begin withholding commission payments to Jillamy and Jillamy sales staff as an offset to customer accounts receivables and purported credit limit overages if Jillamy pulled out of the deal.   This was the first time in the twenty year history of Jillamy's commercial relationship with Mode that anyone at Mode suggested these payments would be withheld in this manner.

24.   Upon information and belief, Malesh made this threat knowing that without these substantial payments, which represented the vast majority of Jillamy profit, Jillamy would suffer catastrophic economic damage to its business, causing irreparable harm and closure within a matter of weeks.   In the more than twenty years of doing business together, the clauses on which Mode purportedly relied to withhold commissions were never enacted, and in fact are rarely if ever used throughout the Mode network. These receivables were not uncollectible and, historically, the commissions had never been withheld in this manner.

25.    Malesh's position was that (i) Jillamy was not permitted to utilize any brokerages other than Mode for services pursuant to the IBO agreement, and (ii) Mode would nonetheless not distribute any of the cash it collected from Jillamy's customers to Jillamy.  The irony to Plaintiffs was that Mode's primary service to Jillamy was cash collection from Jillamy's customers and that Mode was utilizing their delay in collecting as a nuclear weapon against Jillamy.  It was clear to Plaintiffs that this was a blatant attempt at extortion by Malesh, leaving them with no alternatives.  While the Mode services could be replaced by Jillamy with a reasonable amount of time (i.e., 180 days required per the terms of the contract in the event of a "for cause" termination), Jillamy did not have access to enough cash or other assets to weather that transition and related litigation with Mode holding back its earned revenue.

26.    Facing these threats, Kiefer and Kuriger agreed to "come back to the table" and attempt to negotiate the sale.  However, throughout the fall of 2024, it became apparent that Mode intended to stonewall Plaintiffs on any contractual negotiation.  Each time Plaintiffs attempted to make any material modifications to the EAPA, Malesh would become irate and threaten to withhold payments to Jillamy, notwithstanding Plaintiffs repeated explanation that Jillamy could not survive without timely receipt of commissions owed to it.

27.    As an example, Mode distributed a revised LOI to Plaintiffs on Friday, September 27, 2024, which contained numerous deviations from the original business deal presented, including Mode's purported requirement that Jillamy institute a mass layoff and that all top sales agents execute new restrictive covenant agreements, which Jillamy had previously explained was a non-starter for them, was counter to how Jillamy has historically operated with its sales agents and would create significant backlash from the sales team.

28.    Related to the restrictive covenant issue, Malesh had specifically stated on a previous a Zoom call with all parties and lawyers present that the non-competes were not going to be a problem, that they were not a material issue and that Plaintiff's counsel was outrageous for bringing the issue up.  Plaintiff's counsel asked Mode for time to discuss the terms with Plaintiffs before proceeding with a group call discussing the LOI.  Malesh became furious at the Plaintiff counsel's suggestion that she should be allowed to talk things over with her clients, shutting down the deal and telling all participants that he was enacting his commission withholding scheme, shocking and surprising even Mode's own personnel.  Knowing that this meant imminent financial collapse, Kiefer and Kuriger tried calling and texting Malesh, promising Malesh that they would not allow legal counsel to interject further on these deal points despite the materiality of the open issues. Malesh never returned

the calls but instead directed Mode's CFO to let everyone know commissions would not be withheld as long as there was no more attorney pushback on the transaction.

29.    Malesh directly threatened Kuriger and Kiefer in respect of the restrictive covenant agreements that he would personally obtain signatures from the sales agents at any cost and that any cash he paid the agents to sign would be taken out of the Jillamy sale price.

30.    Similarly, when Jillamy asked for several days in October 2024 to address a multi-million lender refinancing issue related to the change of control, Malesh and Mode's CFO again threatened to withhold payments:

- [Mode CFO]: "We've been working hard on our side to get this transaction completed, but it seems that the goalposts keep on shifting and we aren't seeing the level of engagement we need to meet the agreed end of October deadline.  Accordingly, I wanted to let you know that we are going to begin making deductions from Jillamy's commission payments with respect to bad debt and over the credit limit amounts, which we held off on doing these past several months in anticipation of an on-time closing.  The deductions will be $500,000 per weekly commission payment, and will start with the commission payable this coming Thursday October 31st."

- [Kuriger]: "I don't understand what you are talking about. I thought all deductions were already taken out. What are these"

- [Mode CFO]: Given that the closing date agreed upon in the LOI is in jeopardy due to outstanding legal documentation, lender issues and [restrictive covenant agreements] not being received, among other things, we are going to begin deducting bad debt amounts, since we cannot wait for an unknown closing date to make these deductions. We will make those deductions at the rate of $500k per week until the closing occurs."

- [Kuriger]: I thought we were all working towards that still. Why all this hostility all of a sudden. Hoping we can come up with a solution to [Lender] issue Momday (sic)."

- [Malesh]: These is no hostility in [CFO's] email, but there is an urgency to finalize this deal. I am not sure how you can act like this is out of the blue, but if we do not close on October 31st, per the terms of the LOI then we will take the appropriate actions under the terms of our agreement. No hostility, I am just out of patience."

31. Although Mode stated that "bad debt" (i.e., accounts receivable over a completely arbitrary and opaque credit limit) was the purpose for the commission holdback, the timing and complete deviation from the normal operating procedures

-12-

established between the parties over the course of twenty years make clear that this was simply a pretext for Malesh's true motive.  Upon information and belief, Malesh's purpose in directing that the payments be withheld was to force Kiefer and Kuriger to sell Jillamy's assets to Mode on Mode's terms.

32.    Although Plaintiffs considered the potential for a lawsuit against Mode for breach of contract in connection with the commission withholding scheme, Plaintiffs did not have the financial ability to challenge these actions without receiving the commissions generated from Jillamy's customers, which represented the vast majority of Jillamy's revenue.

33.    At all times during the deal negotiation, Plaintiffs were under unlawful economic duress: they could either sell their company's valuable assets entirely on Mode's terms without contractually addressing any of the Mode misrepresentations and other material open issues, or even engaging with Plaintiffs' legal counsel on these issues, or face immediate financial collapse caused by Defendants' bad-faith withholding of payments.

**C.    <u>Defendants' Fraudulent Misrepresentations</u>**

34.    In addition to placing Plaintiffs under extreme economic duress, Defendants Mode and Malesh made a number of material misrepresentations that turned out to be false.  These included, but were not limited to, the following:

50757325v.3

- Malesh and Mode represented that they would not engage in off-shoring of collections, credit and payables;

- Malesh and Mode represented that the Jillamy businesses would operate as a separate division of Mode post-closing ensuring continued autonomy;

- Malesh and Mode represented that Mode would not divert revenues away from the Jillamy business to other subsidiaries and agents;

- Malesh and Mode represented that the Jillamy business would function as the exclusive provider of international services, with significant financial and personnel support from Mode; and

- Malesh and Mode represented that Mode would push all rail and intermodal services towards the Jillamy business.

35.    Each of the aforementioned representations was made by Lance Malesh and/or other Mode executives before the parties entered into the EAPA, with the intent of inducing Plaintiffs to enter the EAPA and was knowingly false.   In fact, after the closing of the acquisition, Mode (i) instituted an offshore collections process, alienating customers, creating numerous operational issues for Jillamy customers and further exacerbating Mode's collection problems, which were well known in the industry as problematic, (ii) stripped the operations purchased from Jillamy of their divisional independence by rolling former Jillamy staff and

operations into Mode, (iii) diverted customer accounts and revenue streams away from the former Jillamy businesses to other Mode subsidiaries and its corporate sales team, (iv) provided no support for international operations, going so far as to divert international revenue opportunities to a Jillamy competitor, and (v) failed to push its rail and intermodal services to Jillamy's division.

36.    Upon information and belief, these representations were made with the specific intent to induce reliance on the part of Plaintiffs as part of the effort to compel them to agree to enter the transaction, ultimately causing significant damages to Plaintiffs.

### D.    The Parties Enter the EAPA

37.    On November 1, 2024, under extreme and unlawful economic duress, based on the fraudulent misrepresentations made by Malesh and Mode and without any reasonable alternative, Plaintiffs executed the EAPA with Mode and its affiliates.

38.    The EAPA provided Plaintiffs with $35,000,000 in upfront consideration (subject to adjustments) and the possibility of an additional $55,000,000 in earnout payments tied to the EBITDA performance of the assets sold to Mode post-closing.

39.    The EAPA included a covenant that Mode "will not take any action in bad faith solely for the purpose of avoiding any Additional Consideration Payment,"i.e., the earnout.

### E.    Post-Closing Breaches and Schemes Aimed at Reducing Earnout Liability

40.    Almost immediately after the closing, Defendants repudiated their promises, repeatedly breached the express terms of the EAPA, and engaged in a series of bad-faith actions designed to undermine the operations they had acquired and ensure Plaintiffs could never realize the benefit of the earnout.

41.    First, Mode weaponized accounts receivable, credit and collections in a manner completely contrary to prior business practice. Once the closing passed, credit suddenly "tightened up" and became very arbitrary. Mode also changed dramatically the manner in which this aspect of the business was handled, relying heavily on inexperienced offshore staff, hindering the ability to collect cash from customers and grow the businesses. This hit Jillamy particularly hard, as they were being double penalized – first, Mode was unable to collect its receivables due to completely ineffective practices, and then Plaintiffs were penalized with loss of earnings credit.

42.    One of the most flagrant credit-related issues related to Mode's cut-off of historically large accounts for Jillamy. The first account was Cardone, a twenty-year customer paying off a $3,000,000 accounts payable balance by $100,000 a

week. Mode arbitrarily decided to stop the payment plan and sue the company, destroying this longstanding relationship.

43.    Even more inexplicable and harmful was Mode's decision to sue the world's largest retailer and one of the fastest growing and largest customers, Walmart.  Walmart had identified certain shipping concerns regarding freight theft and thereby indicated that it would charge Mode for losses resulting therefrom. Rather than working with this key customer to address these legitimate concerns and continuing to move freight while investigating Walmart's concerns, Mode instead cut Walmart off and denied the Jillamy business a multimillion-dollar margin account that would have easily enabled Plaintiffs to make the EBITDA targets.

44.    Destroying these and other, highly profitable, long-term Jillamy relationships over these issues was shocking to Plaintiffs.  The only realistic justification for these erratic practices was to prevent these customers from enabling Plaintiffs to meet the EBITDA targets. Upon information and belief, (i) Mode never took such steps with respect to any of its own longstanding accounts and (ii) the "credit limit" justifications put forth by Mode were solely pretext for its true motive of earnout sandbagging.

45.    Second, Mode implemented an insurance fee scheme, whereby Mode charged customers $8 per load as an "insurance" fee, which was widely known for years to be placed in an accrual fund to offset claims, but pocketed these amounts

instead of applying them to actual insurance costs or crediting them toward commissions and earnout calculations. For years, Mode had allowed this money to be used to offset actual losses incurred in connection with Jillamy customer claims. Post-closing, however, Mode management chose simply to pocket these amounts, costing hundreds of thousands in lost EBITDA for purposes of the earnout calculations.

46.     Third, Plaintiffs discovered that Mode was utilizing a fraudulent pricing system whereby if a vendors charge came in higher than expected, Mode would correct the pricing and charge Jillamy. However, if the costs came in lower than was estimated, Mode would not allow Jillamy or any agent the ability to audit and thus gain the increased margin. When publicly questioned about this practice, Mode's CFO claimed that Mode did not have the ability to track these vendor charges, which is clearly inaccurate considering Mode was charging customers when the charges were too low.  Mode simply pocketed the spread but excluded these amounts for purposes of earnout calculations.  Upon information and belief, Mode generates millions of dollars from this fraudulent pricing scheme.

47.     Fourth, Mode created a centralized billing scheme that had the effect of shifting commissions into later periods, ultimately deferring 2025 revenue into 2026 and sabotaging the 2025 earnout target.

48.     Fifth, Mode provided limited, and in some cases defective, EBITDA reporting to obfuscate the progress toward meeting earnout targets, making it nearly impossible for Plaintiffs to track progress and make operational decisions relevant to the earnout metrics.  When Plaintiffs requested backup used to generate these reports, including the quality of earning and accounting analysis generated by Alvarez & Marsal pre-closing, which was partially paid for by Jillamy, Mode executives simply ignored Plaintiffs.

49.     Sixth, Mode implemented a travel freeze for Jillamy sale staff, while permitting its own corporate sales team, most of whom had no industry experience, to travel to meet Jillamy customers, undermining the customer relationships and costing Jillamy a significant amount of revenue.  To this end, Mode's corporate sales team often interjected directly into customer relationships historically controlled by Jillamy salespersons, undermining customer confidence and Jillamy's ability to continue to generate revenue directly from the customers for purposes of earnout calculations.  Mode's argument that this was for cost cutting purposes was simply pretext for its true motive of earnout sabotage, as Mode continued to send inexperienced salespersons to numerous, costly sales and marketing events – it was simply at the exclusion of Jillamy's salespersons.

50.     Seventh, Mode prevented Jillamy from developing any new product offerings, refused to support the development of new business verticals that

management did not understand and pushed out critical salespersons with belligerent treatment, costing the business millions in revenue.    Mode's core business justifications for turning down millions in new revenue were simply pretext for earnout sabotage, evidenced by other Mode divisions continuing to pursue similar verticals with other agents, including SHIPCO, a Jillamy competitor, in respect of international brokerage. Plaintiffs were shocked when SHIPCO was awarded international carrier of the year by Mode because at this time, Jillamy represented the majority of Mode international business.  The purported rationales put forward by Mode were not only incorrect but were pretext to true motive of limiting Jillamy's international revenue for earnout calculations.

51.    When questioned about any of these tactics, Mode staff either disregarded the questions completely or lashed out at employees.   Malesh in particular was often extremely hostile, belligerent and dismissive of concerns.  As an example, when a key salesperson from Jillamy expressed concern about being cut out of one of his key customer relationships by the corporate sales team, Malesh directly threatened him:

- [Salesperson]: "Lance – Appreciate the meeting and insight today.  I agree with most of what was said, but the details regarding the [Customer] pursuit were disappointing.  Was not a case of them not knowing their rep or only doing 25k in net rev.  If I had an account that

didn't know me, I wouldn't expect to be involved in any growth discussions with them. I sent them to MODE booth at [the conference] in good faith and was subsequently omitted from the following discussions and meetings which seemed short-sighted, deceptive, and ultimately confused the customer. Especially considering we were actively completing their domestic [request for proposal] at the time. It all cleared up with them now, we recently won back the lanes we lost to [competitor] back in 2023 so looking forward to growth in 2025. Hope we can chat more in Mexico. I know your busy. We are all working toward the same goal. More customers and More Revenue. Everyone wins. Have a good week."

- Lance: "I think we should speak sooner than Mexico and if you ever tell me that I am short-sighted, deceptive and confusing a customer again, it will be the last conversation we ever have. I am not sure whom you think you are speaking with, but I am not that person. I have copied Ted [Kuriger] on this email if you want to jump on a video call to say that to my face."

52.     Similarly, when certain members of Mode management became concerned with Malesh's erratic and dictatorial leadership, aggressive treatment of staff and customers, and highly questionable operational decisions, a senior Mode

-21-

salesperson initiated a whistleblower complaint to members of the Mode board of managers. Plaintiffs aligned with other whistleblowers and provided information to York Capital, Mode's majority shareholder, about this mismanagement. Despite promising anonymity, upon information and belief, the whistleblowers' identities were revealed to Mode. In retaliation, Mode launched a pretextual "investigation" of Plaintiffs and stormed Jillamy's offices. Plaintiffs were terminated without notice under fabricated allegations of contractual breaches. Malesh and Mode's true motive was retaliation for whistleblowing and to advance a scheme to reduce earnout liability, because the Purchase Agreement provides that termination of either Plaintiff for "cause" reduces that Plaintiff's earnout by 50%.

## COUNT I
### (Duress - Against All Defendants)

53.    Plaintiffs repeat and reallege the preceding allegations in this Complaint as if fully set forth herein.

54.    Plaintiffs consent to the EAPA was involuntary, obtained as a direct result of Defendants' wrongful acts; specifically, the threats to withhold millions of dollars in commission payments Jillamy had already earned, which would render Jillamy insolvent in very short period of time with no reasonable alternative.

55.    Defendants' threats to hold onto the already-earned commissions necessary for the Jillamy business to continue and refusal to delay the closing of the transaction to allow Plaintiffs to evaluate the open issues or even to consider

appropriate legal advice to determine possible alternatives caused significant damages to Plaintiffs.

56.    While threatening to take specific and immediate steps to cripple the Jillamy business, Defendants also walked back previous promises and refused to make any concessions or accept any reasonable comments to the deal documentation, ultimately compelling Plaintiffs to make a disproportionate exchange of value to protect the Jillamy business.

57.    Given the threat of immediate financial devastation, Plaintiffs had no adequate alternative legal remedy to protect themselves and the business they had built over twenty years by signing the EAPA despite wanting to walk away from the deal.

58.    Defendants' conduct constitutes unlawful economic duress and civil extortion.

59.    Plaintiffs are entitled to recission of the Agreement or damages.

## COUNT II
### (Fraudulent Inducement – Against All Defendants)

60.    Plaintiffs repeat and reallege the preceding allegations in this Complaint as if fully set forth herein.

61.    Defendants knowingly made false representations to induce execution of the EAPA concerning the treatment of Jillamy assets and their operations post-closing.

62.     These representations were material to Plaintiffs' decision to sell and were intended to induce Plaintiffs into executing the EAPA.

63.     Plaintiffs reasonably relied on these misrepresentations to their detriment in deciding to sell the business.

64.     As a result, Plaintiffs have suffered injury and damages in an amount to be proven at trial.

## COUNT III
## (Breach of Contract – Against Mode)

65.     Plaintiffs repeat and reallege the preceding allegations in this Complaint as if fully set forth herein.

66.     Pursuant to Section 2.9 of the EAPA, Mode covenanted and agreed that it "would not take any action in bad faith solely for the purpose of avoiding" the payment of Plaintiffs' earnout.

67.     Mode breached this obligation by, among other things, manipulating billing practices, changing credit policies to the detriment of the Jillamy businesses, eliminating personnel necessary to drive revenue; undermining relationships between Plaintiffs and longstanding customers,  refusing to implement new product lines suggested by Plaintiffs, engaging in various schemes and financial manipulation intended only to reduce the amount of EBITDA attributable to the Jillamy business and aggressively shutting down any dissenting voices.

68.     The aforementioned actions were taken in bad faith with the sole intention to prevent Plaintiffs from obtaining their earnout payments.

69.     Mode's actions were in breach of its contractual obligations to Plaintiffs.

70.     Plaintiffs are in compliance with their obligations under the EAPA.

71.     As a result of Mode's breaches, Plaintiffs have been damaged in an amount to be proven at trial, including up to $55,000,000 in lost earnout payments.

## COUNT IV
## (Breach of Covenant of Good Faith and Fair Dealing -Against Mode)

72.     Plaintiffs repeat and reallege the preceding allegations in this Complaint as if fully set forth herein.

73.     Under Delaware law, every contract includes an implied covenant of good faith and fair dealing.

74.     Plaintiffs reasonably expected Defendants to operate the Jillamy business in good faith, credit it with revenues actually earned, and refrain from taking arbitrary or unreasonable actions designed to deprive Plaintiffs of the benefits of their bargain in selling the business in the first instance.

75.     Mode engaged in bad faith conduct, including pocketing insurance fees, operating a one-sided pricing system, manipulating billing, destroying customer relationships, stripping sales support, diverting all international business away from Jillamy, refusing to implement new product lines suggested by Plaintiffs, engaging

-25-

in various schemes and financial manipulation intended only to reduce the amount of EBITDA attributable to the Jillamy business and aggressively shutting down any dissenting voices.

76.     These actions were arbitrary, unreasonable, and intended to prevent Jillamy from meeting its earnout targets thereby to prevent Plaintiffs from realizing the benefits they had bargained for under the EAPA.

77.     Mode's conduct breached the implied covenant of good faith and fair dealing.

78.     Plaintiffs suffered damages arising from these breaches in an amount to be proven at trial.

## COUNT V
## (Punitive Damages – Against All Defendants)

79.     Plaintiffs repeat and reallege the preceding allegations in this Complaint as if fully set forth herein.

80.     Punitive damages are available for fraud or misconduct showing "wanton disregard for others' rights."

81.     Defendants' fraud and other misconduct showed such a wonton disregard for Plaintiffs' rights.

82.     Plaintiffs seek punitive damages in an amount to be determined at trial.

## COUNT VI
### (Declaratory Judgment - Against Mode)

83.     Plaintiffs repeat and reallege the preceding allegations in this Complaint as if fully set forth herein.

84.     An actual controversy exists regarding the earnout calculations and Defendants' retaliatory conduct and whether these constitute breaches of Mode's obligations under the EAPA.

85.     Plaintiffs seek a declaration that Defendants' actions constitute breach of contract and breach of the implied covenant of good faith, and that earnouts must be calculated without bad-faith reductions and consistent with the EAPA and applicable accounting standards.

## COUNT VII
### (Preliminary and Permanent Injunction - Against All Defendants)

86.     Plaintiffs repeat and reallege the preceding allegations in this Complaint as if fully set forth herein.

87.     Defendants' ongoing misconduct threatens irreparable harm, including loss of goodwill and destruction of earnout value.

88.     Plaintiffs seek preliminary and permanent injunctions under Fed. R. Civ. P. 65 restraining Defendants from diverting revenue, manipulating billing timing, or otherwise acting in bad faith to avoid achieving the earnout and having to make Additional Consideration Payments.

50757325v.3

## COUNT VIII
## (Unjust Enrichment- Against All Defendants)

89.    Plaintiffs repeat and reallege the preceding allegations in this Complaint as though fully set forth herein.

90.    To the extent the Purchase Agreement is void or voidable due to duress or fraud, Defendants have been unjustly enriched by acquiring the Jillamy assets and obtaining the benefits of such assets since November 2024 without fair consideration.

91.    Plaintiffs therefore seek restitution from Defendants.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

(a)    Declaring that Defendants are liable to Plaintiffs under Counts I–VIII of this Complaint;

(b)    Awarding Plaintiffs damages in an amount to be determined at trial, including, but not limited to, the loss of up to $55,000,000 in earnout payments and consequential damages;

(c)    In the alternative, rescinding the EAPA, and restoring the parties to the positions they occupied prior to the execution of that agreement, including restitution to Plaintiffs of the full value of the assets of Jillamy, Inc. and its subsidiaries sold under the EAPA and/or disgorgement of all benefits obtained by Defendants as a result of their wrongful conduct;

50757325v.3

(d)    Awarding Plaintiffs punitive and/or exemplary damages to the extent permitted by law;

(e)    Awarding restitution for any unjust enrichment realized by Defendants;

(f)    Awarding pre- and post-judgment interest on all of the foregoing amounts;

(g)    Declaring that Defendants are in breach of relevant agreements with Plaintiffs;

(h)    Awarding Plaintiffs their costs of suit, including reasonable attorneys' fees, pursuant to law or contract; and

(i)    Granting such other and further relief as the Court deems just and proper.

**WHITE AND WILLIAMS LLP**

By:    */s/ Timothy S. Martin*
Timothy S. Martin (Del. ID 4578)
Daryll Hawthorne-Bernardo (Del. ID 6520)
600 N. King St., Suite 800
Wilmington, DE 19801
Tel: 302-467-4509
martint@whiteandwilliams.com
hawthorned@whiteandwilliams.com

Dated: September 12, 2025    *Counsel for Plaintiffs,*
Theodore Kuriger and Christian Kiefer

50757325v.3