IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THEODORE KURIGER and CHRISTIAN KURIGER, | ) ) ) |
| Plaintiffs, | ) ) ) C.A. No. 25-1142 (MN) |
| v. | ) ) |
| MODE GLOBAL, LLC, TTS, LLC, and LANCE WAYNE MALESH | ) ) ) |
| Defendants. | ) ) |

## **MEMORANDUM OPINION**

Timothy S. Martin, Daryll Hawthorne-Bernardo, WHITE AND WILLIAMS LLP; Wilmington, DE – Attorneys for Plaintiffs.

Lisa M. Zwally, GREENBERG TRAURIG, LLP; Jake Evans, Philip J. George, Jordana Sternberg, GREENBERG TRAURIG, LLP, Atlanta, GA – Attorneys for Defendants

February 18, 2026
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

"Arbitration is a creature of contract." *Hernandez v. MicroBilt Corp.*, 88 F. 4th 215, 218 (3d Cir. 2023). That means, when two parties find themselves at an impasse, the terms of their agreement are responsible for defining whether or not they unmistakably agreed to arbitrate that impasse. If they did, then the Court's responsibility is to honor the parties' agreement and send the dispute to an arbitrator. 9 U.S.C. § 4. But if not, then a court must decide whether the agreement renders that forum appropriate. *Field Intell. Inc. v. Xylem Dewatering Sol'ns Inc.*, 49 F. 4th 351, 356 (3d Cir. 2022). To make that decision easier, parties in commercial relationships will often delegate the question of arbitrability – giving the arbitrator the power to decide whether the parties actually agreed to arbitrate the merits of their dispute. *See Coinbase v. Suski*, 602 U.S. 143, 148-49 (2024) (quoting *First Options of Chicago v. Kaplan*, 514 U.S. 938 (1995)). But what happens when "parties have multiple agreements that conflict as to [] who decides arbitrability?" *Coinbase*, 602 U.S. at 149. The answer to that question decides whether or not the Court must grant Plaintiffs' request to stay and enjoin an arbitration filed against them, or side with Defendants and let that pending arbitration move forward. But here, as is often the case, the answer lies somewhere in the middle. So for the reasons set forth below, the Court will GRANT-IN-PART and DENY-IN-PART Plaintiff's request for injunctive relief.

**I.      BACKGROUND**

      **A.      The Parties' Relationship**

Plaintiffs founded Jillamy, a logistics company responsible for transporting freight and developing customer relationships attendant to that model. (D.I. 1 ¶¶ 12-14). Defendant Mode provided administrative support on the freight work, and the parties shared gross profits. (*Id*. ¶ 14). Jillamy eventually expanded beyond freight, but their business model continued to encourage customers to use Mode's support services, creating overlap that benefited all the parties. (*Id*. ¶¶ 15-

16). This relationship was made possible by Jillamy's status as an "Independent Business Owner", a relationship that the parties first defined in 2002. (*Id*. ¶ 13). Beneficial as it was, Plaintiffs allege that the relationship came under fire in 2022, when Defendant Malesh, Mode's then-recently tenured CEO, sought to internalize many of Mode's revenue streams in preparation for a sale of the business. (*Id*. ¶¶ 19, 20). As part of that effort, Mode sought to acquire Jillamy, and the parties eventually entered a due diligence period in 2023. (*Id*. ¶ 21). Plaintiffs allege that the lead-up, and eventual execution, of the transaction that sold Jillamy to Mode and kept Plaintiffs on as high-level Mode employees was rife with undue pressure, toxicity, negotiation threats, and underhanded tactics. (*E.g. Id*. ¶¶ 23, 26, 30, 33, 35, 36). Notwithstanding, the parties ultimately entered into a set of agreements. Relevant here are the Equity and Asset Purchase Agreement ("EAPA"), which effected the sale of Jillamy; the Employment Agreements, which provided for Plaintiffs' continued employment post-acquisition at Mode and were executed contemporaneously with the EAPA; and the Arbitration Agreement, which was executed 11 days later by the Plaintiffs with Defendant Mode. (D.I. 5-A, 5-B, 5-C).

Once the agreements were executed, and Jillamy sold, Plaintiffs allege that their relationship with Defendants continued to deteriorate. It deteriorated so conclusively that Defendants commenced an arbitration before the American Arbitration Association against Plaintiffs. (D.I. 5-D). That arbitration contains claims arising under both the Employment Agreements and the EAPA. (*Id*. at 31-35). Plaintiffs complain that by including the EAPA claims, the arbitration reaches beyond its scope. As relief, the Plaintiffs ask the Court to temporarily stay the arbitration or otherwise enjoin it pending the conclusion of this case before the Court. (D.I. 4 at 5, Proposed Order). The Court ordered Defendants' response; pursuant to that order, the Defendants submitted that the Arbitration Agreement clearly covered the entire breadth of the

parties' relationship and that relief must be denied and the arbitration permitted to continue. (D.I. 12).

  **B.** <u>**The Contractual Provisions at Issue**</u>

 The thrust of the issue requires interpretation of a few key provisions in the agreements between the parties. Section 8.3 of the EAPA contains a comprehensive dispute resolution clause, defining, in relevant part, the EAPA's governing law and exclusive jurisdiction:

> a) <u>Governing Law</u>. This Agreement, and all claims or causes of action (whether at law or in equity, whether in contract, tort, statute or otherwise) arising out of or relating to this Agreement, the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed and enforced in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Delaware. [. . .]
>
> (b) <u>Consent to Jurisdiction and Service of Process</u>. The parties submit to the exclusive jurisdiction of the state courts located anywhere in the State of Delaware or the United States District Court for the District of Delaware[.]

(D.I. 5-A, § 8.3) (text case altered).

 The EAPA also contains an integration clause; set out below:

> <u>Entire Agreement; Amendments and Waivers</u>. This Agreement, the Cost Sharing Agreement and the **Ancillary Agreements**, together with all Exhibits and Schedules hereto and thereto (including the Disclosure Schedule), constitute the entire agreement among the Parties pertaining to the subject matter of such agreements and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties, including, but not limited to, the letter of intent dated September 27, 2024. This Agreement may not be amended except by an instrument in writing signed on behalf of each of the Parties. No amendment, supplement, modification or waiver of this Agreement will be binding unless executed in writing by the Party to be bound thereby. No waiver of any of the provisions of this Agreement will be deemed or will constitute a waiver of any other provision hereof (whether or not

3

> similar), nor will such waiver constitute a continuing waiver unless otherwise expressly provided."

(*Id*. at § 8.4) (emphasis added).

The integration clause refers to "Ancillary Agreements", which is defined in Section 1.1 of the EAPA to include the Employment Agreements executed by the Plaintiffs. (*Id*. at § 1.1).

Separately, the Employment Agreements contain integration and choice of law clauses:

> This Agreement embodies the entire understanding of the Parties concerning the issues and topics addressed in the Agreement; provided, however, notwithstanding the foregoing, this Agreement does not in any way merge with or supersede, is in addition to and supplements (and is supplemented by), and does not limit (and is not limited by) any other confidentiality, non-competition, non-solicitation, assignment, or restrictive covenant agreement, or any other restriction, if any, Executive has with, owing to, assigned to, and/or inuring to the benefit of MODE under any other agreement or applicable law (including but not limited to any other confidentiality, non-competition, non-solicitation, assignment, or restrictive covenant agreement, or any other restriction, if any, binding upon or otherwise applicable to Executive to the extent contained in the Purchase Agreement or an attachment/exhibit thereto). [. . .]
>
> It is the intention of the Parties that the laws of the State of Texas should govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties hereto without regard to any contrary conflicts of laws principles or provisions of any state or jurisdiction. It is stipulated that Texas has a compelling state interest in the subject matter of this Agreement, and that Executive has had regular contact with Texas in the performance of Executive's job duties and this Agreement. Notwithstanding the terms and conditions of any arbitration agreement between MODE and Executive, either of the Parties shall be entitled to seek a temporary restraining order and any other emergency injunctive relief from a court of competent jurisdiction, restraining the other party from committing or continuing any violation of the provisions of Sections 2 and/or 3 until such time as the controversy may be adjudicated in arbitration. With respect to any such enforcement action, the Parties irrevocably submit to the exclusive jurisdiction of any federal or state court located within Dallas County, Texas or, if a mandatory venue provision is applicable, to the jurisdiction of any other federal or state court

>within the State of Texas required to hear such matter by any such applicable mandatory venue provision.

(D.I. 5-B, §§ 8.1, 9).

Last, the arbitration agreement. The parties executed Mode's form arbitration agreement after the EAPA and Employment Agreements were executed; the arbitration agreement defines the scope of the agreement through multiple passages, set out below:

>This Arbitration Agreement ("Agreement") is between **You (referred to in this Agreement as "You,' "Your, "I", or "Employee') and Your employer (hereafter "Company")**. [. . .]
>
>This Agreement is intended to be as broad as legally permissible, and, except as it otherwise provides, applies to all claims or controversies, past, present, or future, arising out of or related to **Your application and selection for employment, employment, and/or termination of employment with the Company** that otherwise would be resolved in a court of law or before a forum other than arbitration. [. . .]
>
>You and the Company expressly agree that this Agreement amends, supersedes, and/or takes priority over any contrary language, if any, in any confidentiality or restrictive covenant agreement and/or employment agreement between You and the Company that requires a venue contrary to this Agreement for any dispute covered by this Agreement. The parties expressly agree that any disputes arising out of or related to any confidentiality or restrictive covenant agreement and/or employment agreement between You and the Company will be resolved in accordance with this Agreement, including without limitation, the provision that allows either party to seek temporary or preliminary injunctive relief in a court of law in connection with an arbitrable controversy.

(D.I. 5-C, p.1, §§ 1, 13)

## II.   LEGAL STANDARD

Preliminary injunctive relief is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Because a preliminary court order may "allow or disallow anticipated action before the legality of that action has been conclusively determined[,]" a moving party seeking that order must show: (1) a likelihood of success on the

5

merits; (2) irreparable harm absent preliminary relief; (3) that the balance of the equities are in its favor; and (4) that the public interest is supported by the relief. *Nken v. Holder*, 556 U.S. 418, 434 (2009); *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 108 F. 4th 194, 202 (3d Cir. 2024). The first two factors are the most important; a failure to show either a likelihood of success or risk of irreparable harm will "necessarily result in the denial of a preliminary injunction." *Delaware State Sportsmen's Ass'n, Inc.*, 108 F. 4th at 202 (quoting *Nken*, 556 U.S. at 434); *S. Camden Citizens in Action v. New Jersey Dep't of Env't Prot.*, 274 F. 3d 771, 777 (3d Cir. 2001) (citation omitted).

## III.   DISCUSSION

### A.   Likelihood of Success on the Merits

To demonstrate likelihood of success on the merits, Plaintiffs need only show that their argument has a "reasonable probability of success—odds that are significantly better than negligible but not necessarily more likely than not." *Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F. 4th 213, 218 (3d Cir. 2025) (citing *Reilly v. City of Harrisburg*, 959 F. 3d 173, 176, 179 (3d Cir. 2017)) (internal quotations omitted). Here, then, Plaintiffs must show with a reasonable probability of success that either the arbitration agreement is invalid, or its scope does not cover all of the claims submitted in Defendants' arbitration. If the arbitration agreement is valid, then the Court must determine if there was clear intent to delegate arbitrability to an arbitrator, or otherwise leave that question to a court. *See Field Intell. Inc.*, 49 F. 4th at 356-57. The parties agree with that framework. (*See* D.I. 5 at 8; D.I. 12 at 6). On the record before it, the Court is partially convinced by Plaintiffs; a valid arbitration agreement certainly exists, but with respect to the EAPA only, the Plaintiffs have demonstrated the requisite likelihood of success on nonarbitrability.

To begin, both parties agree that the arbitration agreement at issue is valid. Indeed, Plaintiffs say as much. (D.I. 5 at 5) ("Thereafter, the Plaintiffs signed Mode's form arbitration agreement in connection with their employment."). And Defendants, hoping to arbitrate the entirety of the parties' dispute, also agree. (D.I. 12 at 7) ("It is undisputed that valid arbitration agreements exist."). So, the Court is satisfied that a valid agreement exists. The next question, then, is whether the arbitration agreement covers all the claims at issue and delegates arbitrability. Defendants argue it does, because even if the scope of the delegation clause is called into question, both federal and Delaware law require doubts concerning that scope to be resolved in favor of arbitration. And beyond that presumption, Defendants say the question resolves in their favor because the arbitration agreement clearly delegates arbitrability. (*Id*. at 9-10). Plaintiffs, of course, argue the opposite: the EAPA and Employment Agreements contain conflicting language as to forum, there is no clear intent to delegate arbitrability, and the Court must decide whether the claims are arbitrable. (D.I. 5 at 9).

Both parties claim Delaware law supports their position. Here, Delaware law is clear: "when multiple agreements contain conflicting and overlapping forum selection clauses, the record lacks clear and unmistakable evidence of an intent to delegate the issue of arbitrability to an arbitrator." *Fairstead Cap. Mgmt. LLC v. Blodgett*, 288 A. 3d 729, 736 (Del. Ch. 2023). The EAPA contains a forum selection clause directing all disputes to court in Delaware, and the Employment Agreements refer to a thereto unnamed arbitration, or in the event of limited injunctive relief, the state courts of Texas. (D.I. 5-A § 8.4; D.I. 5-B § 9). The arbitration agreement muddies the water further; it provides for a dispute resolution process unique from both the EAPA and Employment Agreements, invoking arbitration under the AAA's Employment Rules. (D.I. 5-C § 4). Simply by referring to those conflicting distinctions, Plaintiffs have established a lack of

"clear and unmistakable evidence of an intent to arbitrate arbitrability." *See* (D.I. 5 at 9); *Fairstead Cap. Mgmt. LLC*, 288 A. 3d at 758.

Thus, having kiboshed a clear intent to delegate arbitrability, Plaintiffs must establish, by some "reasonable probability of success", that the EAPA and Employment Agreement claims are outside the scope of the arbitration agreement. *Veterans Guardian VA Claim Consulting LLC*, 133 F. 4th at 218. Effectively, the question to answer is "whether, by the later contract, the parties intended to extinguish their prior agreement and [arbitrate] any disputes between them moving forward." *Field Intel. Inc.*, 49 F. 4th at 356. Plaintiffs say the agreements are related; the EAPA operates as a sort of "prime" agreement, and the Employment Agreements are ancillary or subsidiary to them. (D.I. 5 at 7). Under Plaintiffs' argument, the arbitration agreement can have no superseding effect on the EAPA, and claims under that agreement must be litigated in this Court pursuant to its forum selection clause. Defendants counter, arguing that the arbitration agreement supersedes *both* the EAPA and the Employment Agreements, such that disputes arising out of both "fall[] within the substantive scope of the [arbitration] agreement". (D.I. 12 at 13-15); *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F. 3d 132, 137 (3d Cir. 1998) (citation modified).

The Court again turns to state law. "Delaware recognizes that where a new, later contract between the parties covers the same subject matter as an earlier contract, the new contract supersedes" in the event of conflict. *Cabela's LLC v. Wellman*, No. 2018-607 (TMR), 2018 WL 5309954, at *4 (Del. Ch. Oct. 26, 2018); *see also Country Life Homes, Inc. v. Shaffer*, 2007 WL 333075, at *5 (Del. Ch. Jan. 31, 2007). But if the subject matter of the agreements are different, then that later-executed contract does not necessarily supersede. *See Centene Corp. v. Accellion, Inc.*, No. 2021-206 (PAF), 2022 WL 989206, *10 (Del. Ch. Mar. 28, 2022). And the existence of a later-executed integration clause "does not *per se* displace a forum selection clause in an earlier

8

executed contract between the parties." *Id*. That is because "the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *E.I. du Pont de Nemours & Co v. Shell Oil Co.*, 498 A. 2d 1108, 1113 (Del. 1985).

That framework leads to a straightforward conclusion: the EAPA, which governed the close of Plaintiffs' sale of Jillamy to Defendants, pertains to different subject matter than the arbitration agreement, was not meant to be superseded, and therefore bears the hallmarks of nonarbitrability. The plain language of the agreements supports that point; the Employment Agreements, which were executed contemporaneously with the EAPA, serve to govern the terms of employment between Plaintiffs and Defendant MODE once the EAPA closing occurred. (D.I. 5-B, § 2.8(b)(vi)). The emphasis on the employment relationship is referenced throughout both the Employment Agreements and the arbitration agreement. (*See, e.g.*, D.I. 5-B §§ 1.1 *et seq.*, 2.2-2.8, 3.1-3.4; D.I.5-C §§ 1, 3) (emphasizing the employer-employee relationship). But that same language does not appear in the EAPA, which is not at all concerned with the employer-employee relationship. (D.I. 5-A §§ 2.1, 2.2, 2.3; *see also* D.I. 5-A, Recitals ("WHEREAS, [Plaintiffs] desire to sell, transfer, convey, assign and deliver to [Defendants], and [Defendants] desire to purchase, acquire, assume and accept from the [Plaintiffs] . . ."). The Employment Agreements, and subsequent arbitration agreement, consider a discrete aspect of the Plaintiffs' relationship with Defendants: their post-closing employment. So, by executing a later arbitration agreement covering that same subject matter (the employment relationship), the parties intended for that later language to control. *Country Life Homes, Inc.*, No. 2288-S (JWN), 2007 WL 333075, *5 (Del. Ch. Jan. 31, 2007). But the same cannot be said for the EAPA, because the Employment Agreements have no role to play over a separate plan which considers "Plaintiffs [selling of] a

9

portion of the business . . . to Defendants," (D.I. 5 at 3); *see also Fairstead Cap. Mgmt.*, 288 A. 3d at 760 (finding a delegation clause in an employment agreement insufficient to override a forum selection clause in an agreement governing an LLC's affairs). Therefore, although inefficient, the plain reading of the parties' contractual scheme shows that if claims arise under both the EAPA and the Employment Agreements, the parties intended they "go forward both in this court and in arbitration." *Fairstead Cap. Mgmt.*, 288 A. 3d at 761.

### B. Risk of Irreparable Harm

Plaintiffs have established likelihood of success on the merits on the EAPA claims. "But the merits are just one piece of the puzzle," so they must also establish the irreparable harm that flows if the Court declines to enjoin the arbitration. *Del. State Sportsmen's Assn., Inc.*, 108 F. 4th at 202. Their argument on harm is simple: if an unwilling party is forced to arbitrate when not required to do so, irreparable harm exists. (D.I. 5 at 14). On that point, Third Circuit precedent is clear: "[a party] would suffer irreparable harm if it were forced to submit to the arbitrator's jurisdiction, if even just for a determination of the scope of that jurisdiction." *PaineWebber Inc. v. Hartmann*, 921 F. 2d 507, 515 (3d Cir. 1990), *overruled on other grounds by Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 85 (2002). So, because Plaintiffs have demonstrated with some likelihood that the EAPA claims were not meant to be arbitrated, having to arbitrate those claims would be irreparable harm. But claims under the Employment Agreements *were* meant to be arbitrated, so irreparable harm on those claims does not exist. Accordingly, the second factor is met as to claims arising under the former agreement, but not as to the latter agreements.

### C. Balance of Equities

On this factor, the Court also concludes the balance of equities lies in favor of the Plaintiffs. Here, the Court must weigh "the potential injury to the plaintiffs without th[e] injunction versus the potential injury to the defendant with it in place." *Issa v. School Dist. of Lancaster*, 847 F. 3d

121, 143 (3d Cir. 2017). As previously noted, without relief, the Plaintiffs would suffer irreparable harm as to the claims they would be forced to unduly arbitrate under the EAPA. Further, as Plaintiffs correctly point out, the Court may decide to enter this limited relief and then ultimately determine that the claims in their entirety should be arbitrated. (D.I. 5 at 15). Should that be the case, then the practical harm of an injunction would be limited, as the arbitration could then dispose of the entirety of the dispute, as per Defendants' contention. (D.I. 12 at 1). And doing so would not delay the arbitration, as it was commenced under the Employment Rules of the AAA, which provide for an automatic stay of proceedings as soon as judicial intervention is sought.[1] (D.I. 12 at 10); Am. Arb. Ass'n. Emp. & Workplace R. and Mediation Proc., R-2 ("Judicial Intervention"). So, on balance, the Court is satisfied that this factor falls in favor of the Plaintiffs.

D.  **Public Interest**

Lastly, the public interest "is not at risk in the instant case." *Becton, Dickinson & Co. v. Tang*, No. 24-11480 (JKS), 2024 WL 5249249, at *3 (D.N.J. Dec. 30, 2024). There is no risk for the public if the parties before the Court are enjoined from continuing to arbitrate their claims. And given the EAPA claims bear all the hallmarks of nonarbitrability, including a duly negotiated forum selection clause, the public interest rests in the "upholding [of] freely negotiated and reasonable business contracts." *Becton, Dickinson & Co.*, 2024 WL 5249249, at *3 (citation modified). Accordingly, the Court finds that the public interest, with respect to the claims arising under the EAPA, weighs in favor of the Plaintiffs.

---

[1] In the intervening time between briefing on the instant motion and this opinion, the AAA's automatic stay lapsed, causing Plaintiffs to file an emergency motion to stay the arbitration proceeding. (*See* D.I. 22). If anything, that the stay has lapsed and Plaintiffs face being forced to arbitrate nonarbitrable claims places the equities further in their favor. *Supra*, p.10. Regardless, because this opinion resolves Plaintiffs' requests, the Court finds that it moots Plaintiffs' motion for emergency stay. The order that follows reflects the Court's finding.

11

## IV. CONCLUSION

For the above reasons, the Court will grant-in-part and deny-in-part Plaintiff's request to stay and enjoin the pending arbitration. (D.I. 4). Appropriate preliminary relief follows.